Good morning. May it please the Court, Michael Sussman from Goshen, New York, arguing on behalf of Ms. Hess. The District Court improvidently granted summary judgment in this case for a number of reasons. First of all, there was direct evidence of age discrimination from three witnesses, the plaintiff, Ms. O'Dell, and Ms. Scalzo. The District Court acknowledged there was a prima facie case made, but the pretext analysis the District Court engaged in was wanting. There were four reasons that were given for plaintiff's termination. Under the progressive discipline policy adopted by the hospital, three of those reasons were never shared with the plaintiff in advance in any manner. The only one which was, was shared at a March 18th meeting. At that meeting, Ms. Hess was accompanied by Ms. Campbell, who was the compliance officer for the company. Ms. Campbell indicated that a 5-day discipline was standard for the Act, which was misfaxing a document. The misfaxing was never actually directly related to Ms. Hess. There were two individuals who were engaged in the faxing, as well as a staff person, and it was never clear who did it. But putting that aside, that's a disputed issue of fact. Three other issues she never had an opportunity to even discuss with anyone who terminated her or was involved in the process, which is where we start getting into problems in this case, because we don't know who terminated her, why they terminated her, because the identity of the individual who terminated her, the identity or identities was never made clear. By that, I mean the following. The second-line supervisor, Ms. Good, indicated that she did not terminate her and did not obtain. She actually terminated her. She was the person at the April 7th meeting. But she did not obtain a recommendation to do that. She didn't know whose decision it was. That's at JA 457, 479 and 80. Ms. Nehru, who was the person who the defendant claimed from the beginning was the decision-maker, stated in her deposition, and I'm looking at pages 404 and 06 of the Joint Appendix, that there was no discussion of the termination with her and that she did not have authority at that point in time in April of 2015 to make the decision, that that authority had been taken from her the year before. Ms. Lamangino testified that Ms. Good told her that someone from HR gave her the direction. That you'll find at 697 through 99 of the Joint Appendix. But Ms. Estramera, who is the person in HR responsible for that unit, testified that she didn't make the decision and did not give the direction. That's at JA 817. So what we had in looking at the case was trying to first understand who made the decision, second of all, on what basis precisely they made the decision, and third, we have that in the context of the aegis comments I referred to earlier. Your Honor, did you have a question? I'm sorry. Oh, okay. I'm sorry. I thought you were. Thank you. Sotomayor, giving you my rapt attention, Mr. Chief. I appreciate it, Judge. Thank you. I just didn't want to interrupt your question if you had one. Thank you. So from our point of view, the case is governed by Reeves in the sense that what Reeves teaches, and I think this has been often neglected in district courts, but it teaches something critical in terms of the role of the court and the jury. They have explanations. The question of whether those explanations are credible or not is highly relevant here for these reasons. With regard to one of the explanations of the four, Ms. Lemangino, according to our client's affirmation and affidavit, gave a specific direction. That direction was do not process this person because the person's insurance was up for grabs. Our client, who was a startup nurse, which meant she was in charge of processing, desisted from the processing for that reason. Ms. Lemangino, in her memorandum, and she's a person who made aegis remarks about our client, attested in the memorandum that that was one of the basis for her criticisms of the client. Now, my client was never confronted with that by anyone. In a position under the progressive discipline policy, that's what ought to have happened. So we don't know, frankly, who made the decision or whether they ever heard in any way from Ms. Hess. We know they never did, because she never discussed it with anyone. So is the proposition that this is they come forward with reasons. Yes, Your Honor. So you've raised enough circumstantial evidence by virtue of the fact that there's a question as to who made the decision. There's a dispute as to whether, you know, there's a question as to who faxed the confidential information. There's a dispute regarding other of the stated reasons. The circumstantial evidence is enough to get to a jury? Well, there's also the issue of the question with Ms. Lemangino. Ms. Lemangino was not, from what we can tell, a decision-maker by dint of her position at the facility. She wasn't in a high enough position. But under Bakke v. Hastings, the circuit has already made clear that where someone who harbors ageist or discriminatory perspective and animus is involved in inputting into the decision, that may influence the decision and taint it. Here, Ms. Lemangino, several months afterwards, and according to the affidavit of Ms. O'Dell previously as well, had made repeatedly ageist comments about my client. Now, if she is in fact fabricating information which goes into the decision, and I suggest a reasonable jury could conclude that here, although I acknowledge there are gaps because we don't know factually really who made the decision. It was attributed to Nehru at the highest level. Nehru, as I have told you and you can read for yourselves, obviously, says she wasn't part of the decision. Others say she was part of it. She says she wasn't part of it. A reasonable jury under Reeves could disregard all that and say they are basically concocting something, they are attributing it to people who don't take responsibility and ownership and in fact move away from it. So, yes, I think you could say circumstantial, but there is also direct evidence here, and it's an unusual case in the circuit where you have direct evidence that a district court says are stray remarks when the direct evidence comes from people in the chain of command reasonably proximate to the time and where it's been successively repeated. The other point is this. I understand there is a line of cases in this circuit which says it's reasonable for an employer to ask about retirement. I understand that. I'm an employer. I could ask someone, when do you plan on retiring? That's different from repeatedly in public places where other people are witnessing it, making deprecating comments that suggest someone should retire, they are too old to work. There has to be a line between those two. It's certainly reasonable for any employer to say to someone, you know, do you have a succession plan? We need to know what your plans are. I get that. That's not the context of the comments here, and to rely on that set of cases seems to me somewhat fatuous. The other point is this. They claim that my client, quote, resigned or retired, but they have had to retreat from that because their own witnesses acknowledged. Certainly the evidence taken most favorably to us is that there was an emotional response which was rescinded within about an hour or two, and they terminated her on the records that they themselves submitted. So I don't think that can save them. The bottom line here is there is clear, direct evidence of age discrimination. There is sufficient evidence of pretext with regard to the reasoning and the people who were making the decision that I believe Judge Karas, who is a brilliant judge and skillful judge, and I acknowledge that, and he certainly writes thorough opinions, but I think that he frankly did not get this one right and that he erred in concluding that there was insufficient evidence to deny summary judgment. So just would you marshal for me just what you said was the clear evidence of age discrimination? Is it beyond Ms. Lemangino's comments? Yes, Your Honor. So my client had a supervisor initially named Walker. At the time, Walker was the supervisor. Good was the second-line supervisor. The testimony taken most favorably by my client is that Walker, and you see this in O'Dell's deposition, made ages comments to my client. My client says she reports that both to Good and Estramella, who is the HR person. She says that they told her, she asked for a new supervisor. She was not given one. Walker left on her own accord. She also says they promised to investigate. There was no investigation. Now, Good was involved in that, so Good would have had knowledge of that and Good would not have responded in a, quote, responsible way to those claims. So that's part of the evidence. That's before, just so we're clear, that's earlier in time. Later in time, the strongest direct evidence is the evidence of Lamangino's comments, which were attested to by both Scalzo, my client, and O'Dell. Thank you, sir. Thank you. And you have reserved two minutes for rebuttal. Good morning, Your Honors. May it please the Court. May it please opposing counsel. My name is Brian Clark from Venable, and I'm here on behalf of the appellee, Mid-Hudson Valley Staff Co. I agree with counsel, Judge Karras wrote a very thorough and comprehensive and very well-reasoned decision. This is a, what this case is, it's a simple case. It's a single claim of age discrimination in the matter of termination, as Judge Karras pointed out. This is not a case of hostile environment. Appellee clearly demonstrated the legitimate nondiscriminatory reasons for the The thing that bothers me most about this record is this business of who fired this lady. Actually, Your Honor, the record is clear. It's very clear, as Judge Karras noted, that there were three people, Nancy Estramera, head of HR, Barbara Good, who was the administrator for the home health care department, and Barbara Nero. And those are the only three decision makers, which the record is crystal clear about. Incidentally, all of them are within the protected age group. Two of the three discrimination, two of the She said she didn't have anything to do with it. Nero said it was discussed. At the time Nero was deposed, she was no longer employed at the hospital. She had a very vague recollection, but did remember she spoke to Barbara Good about it. Both Barbara Good testified that she did the termination. She spoke with Nancy Estramera, the head of human resources, a number of times, and that she did speak with Barbara Nero, who was her boss, the then VP of nursing, and that collectively a decision was made. Of course, you know, over the passage of time, who exactly said what to who can be a bit vague, but it's clear in the record that those were the three who made the decision. The individual's plaintiff claims made, quote, ageist remarks. One had, again, the record is clear, had nothing to do with the decision. They placed a lot of burden on this Linda Lomagino. The record is clear. She knew nothing about the termination, was at the termination meeting, said nothing, afterwards was shocked and upset and attempted to have her superior, Barbara Good, contact human resources to revisit the decision. But she does have these, this evidence of ageist comments made by Walker, and then ageist comments after the termination made by, I pronounce, I don't know. Linda Lomagino.  Chips off the tongue, Your Honor. And she says she's discharged without going through progressive discipline. I realize you say there is no obligation to go through progressive discipline in all cases, but in at least one of the incidents she says as the reasons for the termination is essentially fabricated, that she's being disciplined for not taking action on a state of care plan when she'd been instructed not to do so. Okay. And there are some other things, too. But looking at her, at the circumstantial evidence, I guess I'd, can you tell me why the circumstantial evidence that she raises with regard to the reasons is not sufficient to raise a question of fact here? Certainly, Your Honor, and thank you for the question. You asked a number of things, and I'll try to take them one at a time. I know. One, Linda Walker, who incidentally was age 63 years of age, stopped supervising her three months before the termination incidents, stopped supervising her on January, by January 1 of 2015. As Judge Karras noted, the record is clear. The plaintiff never complained about Walker being ageist or discriminatory. In fact, she avers in her complaint, I never depicted Linda Walker as a discriminator. What's also instructive on that, Your Honors, is, and it's on Joint Appendix page 248, her, and this also goes to how HR didn't investigate things, on Joint Appendix 248, in her response to an appraisal by Walker, she does about a page and a half of comments on Walker. It's all about micromanaging, directing her, never says anything about age, and refers to how I complained about this months before. So you're talking sometime in mid-early 2013, two years before her termination, she's complaining about Walker micromanaging her, not a mention of age, and again, Walker was 63. Unless I misunderstood, I think my colleague's comment went to, you had reasons that you say were the real reasons for firing her, and she says those weren't good reasons for these reasons. And could you tell me what the exact reasons were for firing her? Yes. And how you dispose of what she said about those reasons. Yes. Her, the reason for her term... Am I on the right track? The reason for her termination was within a two-week span, there were four infractions. Remember, this was a start-of-care nurse. She was to initiate, develop, manage, and coordinate health care for home patients. Key to that is organization, attention to detail, documentation. Within four weeks, and only one of these incidents involved Ms. Lomagino, there was an incident of she failed to follow up on developing a start-of-care plan, failed to contact doctors. She entered wrong patient care plan in the wrong patient chart, which was discovered. She was told to correct it, made the correction, but didn't change the medications. So that if that wasn't found, the patient who wasn't getting the medications would have gotten them, and the patient who was supposed to get the medications would not have gotten them. And all of these four incidents, she admitted it occurred. In return to the not, in regarding the not changing the medic... ...things so far. Yes. That's what I'm just saying. On the second, in regard to not changing the medications, which she admitted, she said, well, if I made a mistake, I made a mistake. The third was, again, she admitted this happened. A supervisor directed her to change errors and omissions in her chart. She first said, well, I wasn't here, and so I didn't do that. There was a sign-in sheet showing she was there. And then when the supervisor said do it, she put it, which she acknowledged, was an inappropriate notation in the chart, that I wasn't here that day. Fourth, the HIPAA... Your explanation now is she was concerned you're not, she shouldn't be putting false, she said she wasn't there, she can't put false information in, because that would endanger her license. Well... That's her explanation for that. Well, generally, well, let me just get to the fourth, which was the HIPAA violation, the incorrect sending of confidential patient information to the wrong place. She admitted she filled the fact sheet. She admitted she didn't follow up. So to kind of relate it to what we do, Your Honor, I think if I was an associate and you told me to fax something and I did the fax form, which was the wrong number, and it went to the wrong place, and I said, well, maybe my secretary sent it, I don't think that would excuse me. And she also admitted... I also thought, this goes to your side of the case, she also doesn't deny, she doesn't say she didn't send the fax, she says she doesn't recall. Yes, she doesn't recall. And again, Your Honor, the law is well established. With all due respect, this Court, no court, sits as a super personnel department. Employers are, when you look at the reasons, they could be good reasons, wrong reasons, or no reason at all, as long as it is not motivated or but for discrimination. And there is no evidence that the three individuals who the record clearly shows made the decision had any discriminatory bias. I'll also note, in terms of... So, one, with Lomagino and Walker, they were not decision-makers. The law is clear. Statements by non-decision-makers cannot show pretext. Walker was out of the picture three months before. And again, we submit, the stray remark by Ms. Lomagino was indeed a stray remark. It occurred more than four months after the termination. And as this Court analyzes it under Henry v. Wyeth Farms, you look at who, when, what was the content, what was the context. Made by Lomagino, yes. Four months passed. Content was this, in reference to another employee, a per diem nurse, that she was getting older and losing it, like Hess. As Judge Karras correctly pointed out, the losing it is not necessarily correlated to age. And most importantly, the context was, this was regarding another employee. That employee was not disciplined, was not terminated. So you're talking about a discussion about somebody not fulfilling their reporting requirements, but it's in a context totally unrelated to termination. And I think the record clearly shows, one, that Lomagino had nothing to do with the decision, was only involved in one incident. The HIPAA violation went straight, and I guess, I think this is responding to something you raised earlier, Your Honor. The HIPAA violation went straight to Good. The other two incidents were another supervisor, Loretta Mahoney, who had, again, there's no allegations against her. And at most, there's some evidence that, there's evidence that Good spoke to Mahoney about these incidents. And at most, Lomagino relayed the incidents to Mahoney. In summing, you know, I think it's always good, Your Honor, not to miss the forest for the trees. We're talking about health care, where the first, foremost, and continuing obligation is the health and safety of the patients, along with the legally mandated requirement to guard and protect patient information. There were four infractions that went to the core of that, that went to the core of what a plaintiff was supposed to be doing. And there's no evidence that the individuals who made that decision, who reviewed those incidents, had any age bias. Also note, in terms of following policies, plaintiff admits, as per the progressive discipline policy, each of those incidents she was spoken to about. And the policy also makes clear the employer has discretion in terms of where it initiates the progressive discipline and even gathering together unrelated incidents. So they squarely acted under the progressive discipline policy. And in sum, given four infractions within two weeks in health care, this termination was warranted, and it would have occurred whether plaintiff was 27 or 72. And she has pointed to no comparatives where the hospital acted otherwise. Thank you, Your Honor. There's a lot to rebut in two minutes, but very simply, counsel says it's crystal clear who participated in the termination decision and conversation. He points to Ms. Nehru being involved in conversations and says she acknowledged that vaguely. Please read Ms. Nehru's deposition. She acknowledges nothing of the sort. She said there was one conversation with her, and she did know the content of the conversation. It was about the facts. That's all she said. She said there was no conversation with her about termination. Please read the transcript. With regard to Ms. Estramella, she says directly she was not involved in the termination. With regard to Ms. Good, Ms. Good says she neither recommended the termination nor did anyone recommend the termination to her. That's what she testifies to. So with regard to counsel's formulation, there are disputed issues of fact with respect to his formulation. With regard to the four incidents, one incident my client plainly states directly that she, as we went over earlier, she followed the direction given to her by her supervisor. With regard to a second, there was a meeting. The meeting was about the facts. At that meeting, she did not, quote, admit. She indicated at that meeting that she did not know who sent the facts, that there were two names, Ms. O'Dell's, hers, and a third person. It was not clear who did it. What's clear is Ms. O'Dell was not disciplined for that. The other staff person was not disciplined for that. That's part of the record. With regard to the third incident, as the Court pointed out, my client indicated very clearly she was given direction to change a chart, though she had no personal knowledge that what she was supposed to change it to was accurate, and that is impermissible. Under her license. Judge Karras engaged in blatant fact-finding here, and counsel, it could be no clearer in this regard. A jury should determine what Ms. Lamangino's intent was when Ms. Lamangino makes a comment about my client in an ageist framework. The fact that the other person wasn't being terminated isn't the relevant point. The fact is that she made a comment that my client was, quote, unquote, losing it, even though, as you heard, Ms. Lamangino allegedly cried when she found out my client was leaving and went to personnel and said, please, please, please. There are a million contradictions in this record. And they are to be satisfied under our theory of justice, by a jury, not a district court. Thank you for your time. Thank you, Mr. Sussman. Thank you both.